**WEATHERLY v. JACKSON et al.**

No. 8736.

Court of Civil Appeals of Texas. San Antonio.

Feb. 17, 1932.

Rehearing Denied March 9, 1932.

Hines H. Baker and J. Q. Weatherly, both of Houston, and Carey Legett, of Port Lavaca, for appellant.

Proctor, Vandenberge, Crain & Vandenberge, of Victoria, and Henry, Bickett & Bickett, of San Antonio, for appellees.

FLY, C. J.

Appellant instituted a statutory action of trespass to try title against D. E. Jackson, R. L. Moreman, Mrs. Minnie Garrett, R. L. Garrett, Jr., Mary Catherine Garrett, Hennessy S. Thomas, Francis C. Thomas, Martindale Mortgage Company, and Corpus Christi Hardware Company, appellees herein, to recover a tract of land, containing 149.28 acres, in Calhoun county. The trial court heard the cause, without a jury, and rendered judgment that appellant recover nothing of appellees and that he pay all costs of the suit.

The only muniment of title offered by appellant was an award made to him in 1930 by the commissioner of the general land office of the state of Texas. It was claimed by appellant that the tract sued for was unappropriated land belonging to the state, which had been sold to him for $10 an acre. Appellees, and those under whom they claim, had been in undisputed possession of the land for at least fifty years, claiming to own it, and at the time the survey of the land was made, preparatory to obtaining an award of it, Jackson and Moreman were in possession and had most of the land planted in cotton. The survey of the land was made for the state by a surveyor residing in Chambers county, who is a friend of appellant and who was suggested as the proper man to make the survey. He readily discovered the vacancy sought by his employer. Taxes had at times been paid by possessors of the land to the state. The land was contracted to appellant for the price of $10 an acre, fixed by a surveyor who reported it to be, in part at least, a marsh at a time when cotton was growing upon it. The true value of about 100 acres of the land was shown to be $90 to $100 per acre, and the other part was valued at $60 an acre. Appellant agreed to pay for the land in forty years, on the easy payment plan fixed by the state. No one seems to have had any knowledge of the surveying except the surveyor and appellant; it was so secretly and silently accomplished. While Jackson and Moreman were lulled to inaction by the thought that the encircling arms of the state were protecting them in their rights of property, appellant with the aid of a state officer was depriving them of their rights. Without warning, without a day in court, the state had assumed control of what they deemed their land and awarded it to another for almost a trifle. There are inferences that might be drawn that the Humble Oil & Refining Company, a corporation to which public land could not be awarded, looked on the land with lust for oil hidden perhaps under the coveted acres, and so lust-

ing had an attorney to be their alter ego in the matter. The record fails to disclose any investigation of the purported "vacant land" undertaken by the land commissioner, but that important function was placed in the hands of the prospective purchaser and his surveyor. The sequence was the vacancy was discovered, and it was poor cheap land.

The claim of appellant is dependent upon proof that there was a tract of unappropriated land belonging to the state and an award of the land to appellant. The mere existence of an award did not establish the existence of a vacancy, because there is no such sacredness attached to the act of a public officer as to render it infallible. Especially is this true when it is shown that the officer acted solely upon the representations of the person purchasing the property. It was shown that the representations as to the character of the land and the value were untrue, and this tended to show that the secret survey was not founded on fact. There is no testimony to sustain the claim that there were 149 acres of land unappropriated, except the testimony of the surveyor, which was the sole basis of the award. At the time of the award maps in the general land office not only failed to show a vacancy, but affirmatively indicated there was no vacancy. This state of affairs had been in existence between forty-five and fifty years, during which time Jackson and Moreman and those under whom they claim had valid conveyances of title to the land emanating from the sovereignty of the soil as parts of the Roemer and Miller patents. The owners of the title had been in peaceable adverse possession of the land during all these years "with none to molest and make them afraid." The award by the state may have been prima facie evidence of the decision of the land commissioner that a vacancy existed, but the evidence indicates that he was mistaken in his conclusion and tends to prove that there was no unappropriated land to be awarded by the state. The opinion of the land commissioner as to a vacancy was merely a reflection of the parties desiring to obtain the land at a miserable fraction of its value. The application was made on December 28, 1928, and the award was made on August 1, 1929, about eight days before an act of the Forty-First Legislature had gone into effect. It may at least be surmised that it was made to anticipate that act. The owners of the land had their first notice of the plan to oust them from the land when a demand came from appellant demanding possession. The notice was the more amazing to the persons in possession of the land for the reason that in 1926 Francis C. Thomas had applied to the land commissioner for an award of any vacant land at or near this land, and such award was denied by the land commissioner on the ground that there was no vacant land

in that locality. But when appellant presented his request to the commissioner a change "came over the spirit of his dreams," and he complacently allowed appellant to furnish a surveyor and field notes, and, graciously approving them, he discovered that there was a vacancy, and he awarded it to appellant.

It is the general rule that the sovereign cannot lose its rights by laches or by the lapse of time. This was the common-law rule which was applied to the king, and which rule has been adopted by the United States and the different states. The rule doubtless should apply with peculiar force to the federal government or the state, because the public domain is held here in trust for the citizens, and not as property held by the king for his personal and private purposes. In the case of the doctrine of estoppel the general rule has had exceptions made as to immunity of the sovereign, which has no right to perpetrate a legal fraud on the citizen by its acts of commission or omission. It is easily comprehensible why the state should not be affected by limitations, because, if such were the case, the public domain could not be protected from those who desired to obtain it without paying for it, and the people's possessions taken from them. As said by a federal court in United States v. Willamette (C. C.) 54 F. 807, 811: "The common-law rule that no lapse of time can bar the right of the king is not only recognized in the United States, but is deemed to be applicable with added reason, from the fact that here property is held not as by a monarch for personal or private purposes, but in trust for the common welfare; and, where the agencies of the people are so numerous and scattered, the utmost vigilance would not save the public from loss; but, when matter of estoppel arises, the observance of honest dealing may become of higher importance than the preservation of the public domain."

In other words, the sovereign has no more right to perpetrate a fraud which creates an estoppel by the individual than has the latter. In cases of limitation it is neglect and laches that should not affect the sovereign, in estoppel the state acts through its agents and causes wrong to the citizen. As in this case, the state could not by inaction and neglect lose any right in the public domain, but, when it acts through its officers in such a way as to deceive and delude its citizens, to their hurt and harm, it has perpetrated a fraud for which it will in equity and good conscience be held liable. In this case the state was not merely inactive, but it represented to the possessors of the land that there was no vacancy, and refused to award the land because it had none to award in that locality. The possessors of the land acted on that representation and expended their

money to improve and cultivate it and paid taxes on it to the state.

The case of United States v. Stinson, 197 U. S. 200, 25 S. Ct. 426, 49 L. Ed. 724 substantially held that, the government may not in conscience ask a court of equity to set on foot an inquiry that under the circumstances of the case would be an unfair or inequitable inquiry. The substantial considerations underlying the doctrine of estoppel apply to governments as well as to individuals.

Numerous Texas cases apply the doctrine of estoppel in pais to municipal corporations, agencies of the state. City of Victoria v. County of Victoria (Tex. Civ. App.) 94 S. W. 368; Krause v. City of El Paso, 101 Tex. 211, 106 S. W. 121, 14 L. R. A. (N. S.) 582, 130 Am. St. Rep. 831.

■■ Equitable estoppel arises when a party conducts himself in such way as to mislead another to his damage; such person being ignorant of the facts. This is one phase of estoppel which applies in this case.. The possessors of the land in 1926 sought to obtain an award if there was any vacancy, and the commissioner refused the award; stating there was no vacancy. The commissioner had maps of the tract of land in his office, and he was charged with knowledge of the status of the land desired to be awarded. D. E. Jackson and R. L. Moreman relied upon his assertion and acted upon it. They believed it to be true until awakened by the intrusion of appellant holding an award to the land. The conduct of the commissioner taken with other circumstances constituted estoppel. Pomeroy, Eq. Jur. vol. 2 (4th Ed.) §§ 804 and 805.

■■ The evidence fails under the statutes as to unappropriated lands. The appellant was a resident of Harris county, and was the active attorney of the Humble Oil & Refining Company, and went to Calhoun county to see about the land. He it was who furnished the surveyor who claimed to have made the survey and placed the value on the land. The surveyor was brought to Calhoun county from Chambers county, which was not a long distance from Houston, nor from a well-known field of operations of the oil and refining company. The law does not permit a corporation to be given an award of unappropriated land. Article 5306, Rev. St. There was testimony that tended to show that the oil company was surveying land in Calhoun county about the time appellant claimed to have made the survey. Appellant was very active in obtaining a surveyor that he desired, and recommended three of four surveyors, among the number Work, who made the survey. Appellant seemed anxious to prevent any surveyor from Calhoun county from making the survey, but wanted some one in the region of the oil operations and the domicile of the oil company which he represented. The oil company continued its surveys in Calhoun county in 1929, after the award had been made. The testimony arouses grave suspicions that the award was made in the interest of the Humble Oil & Refining Company. It is improbable that a Houston attorney who had never been in Calhoun county should have discovered a vacancy in lands in that county, except through some agency desirous of appropriating land under which there might be oil.

The circumstances under which the land was surveyed and the award obtained at the miserable price of $10 an acre did not raise any presumption of any investigation upon the part of the land commissioner or of fairness in issuing the award. A former investigation of the land commissioner, at the time the present commissioner was chief clerk in the land office, we may presume had convinced that department of the state government that there was no vacant land where the award was made. According to the statement made to one or more of the appellees, there was no unappropriated land in the locality in controversy, and under the Constitution and laws the attempted award was null and void.

The power of the award to convey the land depends on the existence of unappropriated land. If there was no vacancy, the award could not create one. The evidence did not in a satisfactory manner supply the sine qua non of the validity of the award.

The judgment is affirmed.